UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID KARCH

Plaintiff,                                    Case No. 20-12321

v.                          UNITED STATES DISTRICT COURT JUDGE
                                        GERSHWIN A. DRAIN

HARMAN INTERNATIONAL
INDUSTRIES, INC.

Defendant.
_____/

## OPINION AND ORDER: (1) DENYING MOTION FOR SUMMARY JUDGMENT [ECF NO. 46]; AND (2) AMENDING SCHEDULING ORDER

### I.    Introduction

On March 10, 2020, Plaintiff David Karch ("Karch") filed a Complaint alleging a claim against his former employer Harman International ("Harman") for breach of contract. [ECF No. 1]. Before the Court is Harman's motion for summary judgment. It was filed on September 9, 2022. Karch responded on October 19, 2022, and Harman replied on November 4, 2022. The motion is fully briefed.

1

Upon review of the parties' submissions, the Court concludes oral argument will not aid in the resolution of this matter. Accordingly, the Court will resolve the motions on the briefs. See E.D. Mich. L.R. 7.1(f)(2).

For the reasons below, the Court **DENIES** Harman's motion for summary judgment.

## II.    Factual Background

Karch began his employment with Harman as Director of Manufacturing and Advanced Manufacturing in January 1998. Over the years, he was promoted to several positions in the automotive and manufacturing divisions. On May 6, 2008, Karch was promoted to a newly created position of Senior Vice President, Operational Excellence. In this position, Karch reported directly to Harman's Chief Executive Officer, Dinesh Paliwal ("Paliwal"), and became a member of Harman's Executive Committee (the "EC").

In 2010, Paliwal and Karch agreed that Karch would work as Harman's Executive Vice President, Operational Excellence and Head of Automotive Asia, which required him to move to Shanghai, China for an anticipated duration of three years. [ECF No. 46-2, PageID.412]. He signed an International Assignment Letter Agreement on August 4, 2010 (the "2010 International Assignment Letter"). It

outlined certain terms including Karch's base salary over his three-year assignment in China. [ ECF No. 46-2, PageID.413].[1] As stated, the agreement "confirm[ed the parties'] mutual understandings of the terms and conditions applying to [Karch's] assignment. . . [Id].

Karch's leave from the EC did not occur until 2011. In a written agreement (the "2011 Leave Agreement"), Harman stated that Karch would "maintain all of [his] EC benefits," and "be reinstated to the executive committee" when he returned to the U.S. [ECF No. 50, PageID.687]. It stated:

1. We are hereby granting you a temporary leave of absence from Harman's Executive Committee (the "EC"), effective June 1, 2011 (the "Effective Date"). This leave of absence will continue for a period of your assignment in China (the "Leave Period") or maybe ended sooner if mutually agreed. Upon conclusion of the leave of absence you will be reinstated to the Executive Committee of Harman International.

3. . . . During the Leave Period all other terms and conditions of your employment (including, but not limited to, base salary, target bonus opportunity, stock options and benefits) will remain unchanged as if you were an active Executive Committee member.

---

[1] Karch's base salary would "remain $376,800, he would continue to be eligible to participate in the Management Incentive Compensation program with a target bonus opportunity up to 75% of [his] base salary, and [he] would receive a lump of $50,000 payable upon arrival to China" [Id]. "During year 2 and 3 of the assignment, the agreement promised him a monthly sum of $4,166.66 in additional pay starting the 13th month of his assignment and ending with the 36th month of his assignment." [Id].

[ECF No. 50-12, PageID.777]. As required by the writing, Karch indicated his "acceptance of the terms" by "executing and returning the executed letter to the sender." [Id].

On August 13, 2013, Karch and Harman entered into a 2013 International Assignment Letter agreement using the same terms as the 2010 International Assignment Letter, except it stated: (1) "[t]his letter confirms our mutual understanding of the terms and conditions applying to the extension of your assignment as Head of Global Manufacturing located in Shanghai, China[;]" and (2) "[t]he anticipated duration of this assignment extension is one (1) year, September 1, 2013 through August 31, 2014." [ECF No. 46-6, PageID.428].

According to Karch's deposition, in August 2014, Karch met at the Harman headquarters in Stamford, CT. [ECF No. 51-1, PageID.932]. Karch testified that, at the meeting (with Stacey in attendance), Paliwal told Karch that "he didn't have an opportunity to put me back on the executive committee now, but that he was going to afford me the first opportunity that a position became available. I would [then] go back to the executive committee." [Id]. Paliwal explained that given additions to the Executive Committee during the leave of absence, he did not want to expand the size of the group - but assured Karch that he would put him back on the committee "as soon as an opening was available." [Id., at PageID.933].

4

Karch allegedly expressed his disappointment with Paliwal, and allegedly told him that it violated his written letter agreement and felt he should rectify it by reinstating him to the EC when his assignment in China terminated. [Id]. Karch says he considered Paliwal's assurance to be "a verbal understanding, contract, agreement that … I would be reinstated at the first available opportunity." [Id].

It is undisputed that Harman never reinstated Karch's EC membership or benefits. However, Karch continued to work at Harman until his employment was terminated in February 2018.

## III.   Discussion

The facts are disputed in this case, they show that a reasonable jury could believe that Harman agreed to reinstate Karch to the EC after his China assignment in exchange for Karch taking a leave of absence from the EC. Although Karch does not bring a wrongful termination claim, he claims damages from the date of the purported August 2014 breach, until the termination of his employment in February 2018.

Karch says Harman breached the 2011 Leave Agreement. When he returned from his EC leave, Harman: (1) failed to reinstate him to a position on Harman's corporate Executive Committee, and (2) failed to restore Karch's base salary, target

5

bonus opportunity, stock options, and benefits to the level of an active member of Harman's corporate Executive Committee from 2012-2018. [ECF No. 1, PageID.3].

Harman argues that: (1) Karch's claim is barred by the statute of limitations; (2) damages arising from a breach of a promise to reinstate Karch to the EC position are speculative due to its "at-will" status; and (3) the 2011 Leave Agreement's promise to reinstate lacks consideration. The court will discuss each argument in turn.

### (1) Summary Judgment Standard

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists. *Bennett v. City of Eastp*ointe, 410 F.3d 810, 817 (6th Cir. 2005) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party has carried its burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

6

The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252. The function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249).

### (2) The Statute of Limitations for Breach

Karch filed his complaint on August 26, 2020. Harman says, "any breach of contract would have had to occur on August 26, 2014." [ECF No. 46, PageID.392]. The six-year limitations period for breach of contract begins to run when the promisor fails to perform under the contract. M.C.L.A. § 600.5807(8); *Miller-Davis Co. v. Ahrens Const., Inc.*, 495 Mich. 161, 848 N.W.2d 95 (2014).

Harman argues that the purported breach occurred at the time Karch signed the 2013 International Assignment Letter and transitioned into his Head of Global Manufacturing position, as this was when his assignment in China ended as defined by the 2011 Leave Agreement. [Id]. Harman believes the Leave Period was tied to

Karch's job duties. As the argument goes, when his duties focusing solely on the automotive division were expanded, the Leave Period ended. Under Harman's interpretation of the contract, the parties agreed that the leave of absence from the EC would last for only the period that Karch was focusing solely on developing Harman's automotive business in Asia. Thus, Karch was arguably entitled to reinstatement to the EC when his China assignment was extended, and his job duties were expanded beyond Asia in 2013. [ECF No. 46, PageID.392].

This argument impermissibly invites the Court to weigh the evidence and interpret contractual documents beyond their plain meaning. *See Cadillac Rubber & Plastics, Inc. v. Tubular Metal Sys*., *LLC*, 331 Mich. App. 416, 423 (2020) ("If contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law").

The unambiguous terms of the 2011 Leave Agreement do not define the duration of the Leave Period. That term was set at 3 years by the 2010 International Assignment Letter Agreement and extended by a year in the 2013 International Assignment Letter Agreement. Under the unambiguous provisions of these agreements, the Leave Period was set to conclude on August 31, 2014. [ECF No. 46-6, PageID.428]. The 2013 agreement also changed Karch's position to "Head of

Global Manufacturing located in Shanghai, China," and his job duties also changed. [Id]. That language does not unambiguously manifest an intention of the parties to tie the duration of the Leave Period to Karch's job duties in the automotive division.

As Karch points out, there is a genuine issue of material fact regarding whether the parties intended his "China assignment" to refer to his job duties in Harman's automotive division, rather than the location where he worked. Under the former interpretation, he would have been entitled to reinstatement to the EC as soon as his job duties changed in 2013. Under the latter interpretation, Karch would not have been entitled to reinstatement until his "extension" expired in August 2014.

Harman also argues that "Karch admits he knew by the middle of August 2014 that Paliwal was not returning him to the EC and believed Paliwal's actions violated the Letter Agreement." [ECF No. 52, PageID.976].

Viewing the facts in the light most favorable to Karch, Harman was not required to perform until August 31, 2014. When Paliwal informed Karch that he would not be reinstating him to the EC upon his return from China, Harman may have anticipatorily breached the 2011 Leave Agreement.

Under the doctrine of anticipatory breach, "if a party to a contract, prior to the time of performance, unequivocally declares the intent not to perform, the innocent

party has the option to either sue immediately for the breach of contract or wait until the time of performance." *Brauer v. Hobbs*, 151 Mich. App. 769, 776 (1986); *Dongah Tire & Rubber v. Nucleon LLC*, 2007 WL 9735705, at *3 (E.D. Mich. Mar. 29, 2007) (citing *Brauer*). Michigan courts give the non-breaching party the choice to decide whether he will regard an anticipatory breach as final or continue to demand performance until the breach occurs and the statute of limitation accrues.

There is a genuine issue of material fact regarding when the Leave Period ended, and the purported breach occurred.[2] For these reasons, Harman's motion for summary judgment with regard to the statute of limitations is **DENIED**.

### (3) Contract Law

To prevail on a claim for breach of contract, the plaintiff must establish that: (1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach. *Bank of Am., NA v. First Am. Title Ins. Co.*, 499 Mich. 74, 878 N.W.2d 816 (2016).

---

[2] Karch appears to claim damages starting from the beginning of the Leave Period in 2012, arguing that, under the 2011 Leave Agreement, Harman was required keep all other terms and conditions of his employment (including, but not limited to, base salary, target bonus opportunity, stock options and benefits) the same as if he were an active Executive Committee member. However, Karch's claim for damages from 2012-2014 is barred by the six-year statute of limitations because he did not file a claim for breach until August 2020.

A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *AFT Mich. v. Michigan*, 497 Mich. 197, 235, 866 N.W.2d 782 (2015).

Elements (3), (4), and (5) are all highly disputed. Harman argues that: (1) Karch's claim fails because there was no consideration on his behalf; (2) Karch cannot establish a prima facie case for a breach of contract because his damages are purely speculative; and (3) Karch cannot establish a breach of contract claim because he was an at-will employee. [ECF No. 46, PageID.380].

### 1. Whether Consideration, Mutuality of Agreement, and Mutuality of Obligation are Present

First, Karch argues that Harman waived its lack of consideration defense by failing to plead it as an affirmative defense. He also argues that consideration was present because the mutual obligation of the parties is clear on the face of the contract. [ECF No. 50, PageID.702]. In exchange for Harman's promises regarding compensation during and reinstatement to the EC after the period of his assignment in China, Karch agreed to take the leave of absence from the EC and conform to a different reporting hierarchy. [Id].

11

Harman raised its lack of consideration defense for the first time in its motion for summary judgment two years after it filed an answer. In fact, Harman's answer to the complaint states:

> 55. KARCH provided HARMAN with adequate and sufficient consideration in exchange for the contractual obligations undertaken by HARMAN under said contract.
>
> ANSWER: Defendant admits the allegations in Paragraph 55 of the Complaint.

[ECF No. 8, PageID.50].

Fed. R. Civ. Pro. 8(c) generally requires defendants to "affirmatively state any avoidance or affirmative defense" in their first response to a pleading. The failure to do so may result in waiver of the defense. *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 680 (6th Cir. 2018). Rule 8(c)(1) enumerates "failure of consideration" as an affirmative defense. However, "failure to raise an affirmative defense by responsive pleading does not always result in waiver" if a party can show that the opposing party was on notice of its defense and prejudice is absent. *Id*.

Harman does not reply to Karch's waiver argument, offer any explanation for its admission that consideration was present, or dispute Karch's insistence that he provided sufficient consideration. Harman's failure of consideration defense is waived.

12

In *Sepanske*, the Michigan Court of Appeals held that an employer's policy providing that, an at-will employee returning from social service leave would be reinstated in their former position or position of equal or greater responsibility, was a contractual obligation. *Sepanske v. Bendix Corp*., 147 Mich. App. 819, 826 (1985) (overruled on other grounds). The court observed that the employer's policy created a contractual obligation even in the absence of a written contract between the individual plaintiff and the employer. *Id*. And the employer was not duty bound to establish such policy or agreement. *Id*.

Similar to how the statements of company policy created a contractual obligation in *Sepanske*, here a reasonable jury could conclude that Harman's statements to Karch in the 2010, 2011, and 2013 agreements created a contractual obligation. They also created an expectation that, if Karch took leave from the EC during his China assignment, he would be reinstated upon his return from China.

In the next section, the Court will discuss whether Karch is able to establish the damages element of his breach of contract claim.

## 2.  Harman's Damages Argument

Damages are an element of any breach of contract claim. *Miller Davis Co. v. Ahrens Constr., Inc*., 495 Mich. 161, 178 (2014). In a contract action, the injured

13

party may seek damages for an injury that was caused by another party's breach of a contractual promise or obligation. *Genesee Co Drain Comm'r v Fenton Charter Twp*, 504 Mich. 410, 419 (2019).

"[T]he remedy for the breach may be compensatory damages." *Id*. Compensatory damages are those that naturally arise from the breach or those that were in the contemplation of the parties when the contract was formed. *Id*.  The party asserting a breach of contract has the burden of proving its damages with reasonable certainty. *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 550-551 (2017). [D]amages are not speculative merely because they cannot be ascertained with mathematical precision." *Berrios v. Miles, Inc*., 226 Mich.App. 470, 574 N.W.2d 677, 680 (1997) (citations omitted).

It is sufficient if there is a reasonable basis for computation, even if the result is only approximate. *Id*.; *Green Leaf Nursery, Inc. v. Kmart Corp*., 485 F. Supp. 2d 815, 819 (E.D. Mich. 2007). Damages awarded in a common-law breach of contract action are "expectancy damages designed to make the plaintiff whole." *Frank W. Lynch & Co. v. Flex Techs., Inc*., 463 Mich. 578, fn4 (2001).

After Karch's China assignment ended in August 2014, his employment with Harman continued until February 2018. Harman argues that the at-will status of

14

Karch's contract makes any damages arising from breach speculative as a matter of law because Karch and his EC position could have been terminated at any time, without cause.

### A. Whether Damages Arising from Breach of At-will Employment Contract are Speculative as a Matter of Law.

Ultimately, the state of the law in the Michigan Supreme Court and the Michigan Court of Appeals does not support Harman's argument that damages arising from breach of an at-will employment contract are speculative as a matter of law.

Harman relies on *Walker v. City of Detroit*, 2003 WL 178791, at *2 (Mich. Ct. App. Jan. 24, 2003). In that case, the court held that a plaintiff police officer failed to assert a claim for breach of at-will employment contract by wrongful demotion. *Id*. The court reasoned that plaintiff failed to produce a contract showing that his police status could not be revoked without just cause. *Id*. Defendant simply made no promise that it would avoid demoting plaintiff without cause. *Id*. *Walker* is distinguishable because Karch does not claim that he was wrongfully terminated or demoted, and Harman promised—without exception—to reinstate Karch to the EC. Unlike the absence of a promise not to demote in *Walker*, Harman created Karch's contractual right to be reinstated.

15

Likewise, Harman's reliance on *Cessarini* is misguided. In that case, the plaintiff took a leave of absence with a hope that she would be reinstated with comparable benefits upon her return. *Cesarini v. FCA US, LLC*, 2019 WL 2711584, at *4 (Mich. Ct. App. June 27, 2019). The court granted summary judgment to defendant because plaintiff was an at-will employee and the agreement did not contain any clear and unequivocal representation that plaintiff would be guaranteed a position after her leave of absence. *Id*. This meant that no contractual obligation to reinstate her existed. *Id*. Further, Plaintiff's own e-mail demonstrated her understanding that there was no guarantee that she could return to her same or similar position upon return from her leave of absence. *Id*.

As shown by the 2011 Leave Agreement, *Cessarini* is distinguishable because Harman made Karch a written promise, using unequivocal language, that he would be reinstated to the EC upon conclusion of the Leave Period.

Harman also relies on *Kvintus v. R.L. Polk & Co*., 3 F. Supp. 2d 788, 797 (E.D. Mich. 1998), aff'd, 194 F.3d 1313 (6th Cir. 1999). The court held that no promise to reinstate the plaintiff after leave was made and it stated in *dicta* that, "even if defendant's employees did communicate to plaintiff that he would be reinstated to his position upon his return from medical leave, defendant's promise cannot be construed as anything more than a promise to return plaintiff to an at-will

16

position." *Id*. The *Kvintus* court relied on *Smith v. F.W. Morse & Co., Inc*., 76 F.3d 413, 426 (1st Cir.1996), where the First Circuit held that: "[a] contract to reinstate an at-will employee to an at-will position (from which she could immediately be removed without cause) is no contract at all." *Id*.

*Kvintus* is unpersuasive because its holding was premised on a wrongful termination claim, which alleged that, despite his at-will employee status, he was terminated without cause. The issue for Karch is not whether Harman wrongfully terminated his at-will employment. Further, *Kvintus* relies on *Smith*, which applies New Hampshire law.

Michigan law is not so clear on the propriety of damages resulting from breach of at-will employment contract claims. Two cases *Sepanske* and *Enviroair*, illustrate the Court's analysis regarding Harman's argument. As the Court will discuss below, it is particularly important that Michigan courts have overruled or limited both precedents.

In *Sepanske*, the Michigan Court of Appeals addressed the propriety of the jury's damage assessment in a case involving breach of an agreement to reinstate an at-will employee who had previously taken social security leave. *Sepanske* 147 Mich. App. at 829. It held that the damages award was purely speculative because:

"[t]here is no tangible basis upon which damages may be assessed where plaintiff's expectation was for an at-will position which could have been changed or from which he could have been terminated without consequence." *Id*. The case was remanded to the trial court for entry of judgment in favor of the plaintiff for nominal damages only. *Id*.

In *Environair*, a 1991 Michigan Court of Appeals panel concluded that *Sepanske's* holding regarding the speculative nature of damages arising from breach of an at-will employment contract should apply equally to the loss of an at-will contract outside the context of an employment action. *Environair, Inc. v. Steelcase, Inc*., 190 Mich. App. 289, 295 (1991) (overruled by *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.,* 268 Mich. App. 83 (2005).

But the Michigan Supreme Court and the Michigan Court of Appeals have since overruled *Enviroair* and restricted the scope of *Sepanske's* holding.[3]

---

[3] The Michigan Supreme Court has addressed *Sepanske*. *See Phillips v. Butterball Farms Co*., 448 Mich. 239, 253 (1995) (Holding that "plaintiff had a reasonable expectation that she would not be terminated for filing a worker's compensation claim, despite the at-will nature of the employment relationship. Recovery under the public policy exceptions to the employment at-will doctrine arises independently of the employment contract"). And distinguishing *Sepanske*, 147 Mich.App. at 829).

18

In *Health Call*, the court held that a plaintiff corporation that provided home health care services was not restricted to recovering nominal damages on its tortious interference claim against its competitor and breach of contract claims against its independent contractor nurses. *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich. App. 83, 85-86 (2005). The court found that lost profits sustained by plaintiff were not impermissibly speculative even though the damages calculation would depend on the duration of an at-will contract terminable without cause at any time. *Id*.

The incident arose when the plaintiff corporation's nursing client terminated her at-will home nursing contract with the plaintiff corporation. *Id*. The court held that the corporation could seek future damages for lost profits due to defendant independent contractor nurses' breach of a contract and the defendant competitor's improper role in facilitating the client's termination of her at-will contract with plaintiff. *Id*. The court required plaintiff to prove that, but for the alleged tortious interference by defendant competitor and breach of a contract existing between the defendant nurses and the plaintiff corporation, the client would have continued to honor her contract and use plaintiff's nursing services beyond the date of actual termination. *Id*.

19

The court gave plaintiff an opportunity to satisfy this burden of proof even though the services at issue for damages purposes—and the duration of those services—were provided through an at-will home nursing contract that could have been terminated any time. *Id*.

Notably, *Health Call* reasoned that the evidence was sufficient to survive summary disposition because it established damages with reasonable certainty given that the client had a continuum of nursing care using the same defendant nurses (who worked for plaintiff) before, during, and after she terminated the home nursing contract. *Id*. Further, the client testified that she asked the defendant competitor corporation to keep the same nurses on staff, even after the client terminated her services contract with plaintiff. *Id*. at 100.

Viewing the facts in the light most favorable to Karch, *Health Call's* reasoning applies here. It is true that *Health Call* addressed an at-will contract outside of the employment context. But it also held that:

> a blanket rule limiting recovery to nominal damages as a matter of law in all actions arising out of or related to the termination of at-will contracts is not legally sound, because there may exist factual scenarios in which there is a tangible basis on which future damages may be assessed that are not overly speculative despite the at-will nature of the underlying contract.

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc*., 268 Mich. App. 83, 706 N.W.2d 843 (2005).

Finally, the Michigan Court of Appeals' ruling in *Everton* suggests that, generally, *Health Call's* holding should apply to all at-will contracts and at-will employment contract alike. *Everton* addressed an employee's potential recovery on his claim against a co-worker for tortious interference with his business expectancy of continued employment. The court held again that recovery was not limited to nominal damages, even though the damages calculation would depend on the duration of the employee's at-will employment contract. *Everton v. Williams*, 270 Mich. App. 348, 353 (2006).

It rejected the argument that *Health Call's* holding applied only to cases involving at-will contracts outside of the employment context. *Id*. The court reasoned: "There is no obvious reason to distinguish between types of at-will contracts [employment or otherwise], particularly with respect to the issue of damages arising out of or related to their termination, because the same difficulty in establishing damages is inherent in all types of cases." *Id*.

*Everton's* interpretation of *Health Call* suggests that: (1) *Health Call* recognizes that *Sepanski* may not apply in some cases related to termination or

breach of an at-will employment contract; and (2) damages are not barred as a matter of law in those types of cases either.

Similar to *Health Call*, Karch submitted evidence that may establish a continuum of employment before, during, and after the purported breach of contract. And this lends some reasonable certainty regarding the causation of Karch's damages. The alleged breach occurred in August 2014, Karch remained employed at Harman until 2018. A reasonable jury could conclude that, but for the breach, Harman was likely to have kept Karch on the Executive Committee until his termination in 2018.

Karch aids the jury's determination by testifying that his job performance met or exceeded expectations. Further, Harman's Vice President of Corporate HR and Global Rewards, Lori Lampman emailed John Stacey, the Chief Human Resources Officer, on August 25, 2014, stating that Karch "has been grandfathered as a grade 20 with the special EC-level LTI grant." [ECF No. 50-21, PageID.825]. Due to the continuum of employment and Karch's apparent qualifications for the EC level position, *Health Call* permits the court to find that damages here are not necessarily speculative as a matter of law. Of course, Harman is permitted to introduce evidence showing that it would not have continued to employ Karch on the EC between 2014-2018.

**B. Whether Karch's Method of Calculating Damages is Speculative**

Karch argues that, upon the conclusion of his assignment in China and return to the United States on August 31, 2014, Harman failed to reinstate Karch's base salary, establish his target bonus opportunity, issue him retention bonuses, grant him stock awards and stock options, or provide him with employee benefits at the level Karch previously received as a member of the EC before the 2011 Leave Agreement was executed. [ECF No. 1, PageID.8]. Karch's base salary and EC benefits were outlined in the 2010 International Assignment letter agreement. See *Supra* fn2. At minimum, the jury has a reasonable basis to calculate these damages if it finds that Karch would have remained on the EC between August 31, 2014 and February 2018.

Karch also argues that the amount of damages he claims is tied to the compensation of Harman's former Executive Vice President of Operational Excellence, David Slump. [Id. at 9]. Karch allegedly reported to Slump beginning in 2015 until his termination. Karch alleges that Slump's move into the Operational Excellence position (an EC position) in 2015 was improper because Paliwal should have promoted Karch into that role. Based on Slump's compensation, Karch argues that he suffered losses totaling $293,202, through the date of his termination in February 2018.

As Harman points out, compensation decisions for EC members are individualized to each member. And Karch does not support his argument with facts or explain why he was particularly entitled in 2015 to receive the same compensation package Slump received for the Executive Vice President Operational Excellence position. Further, he does not produce evidence to show that he was equally as qualified as Slump. The fact that the Executive Vice President Operational Excellence position became available while Karch awaited reinstatement and Slump was appointed to that position does not afford the jury a reasonable basis to assume that Karch would have received the same compensation as Slump, even if he had been appointed to the same position.

The Court finds that Karch's circumstances would permit the jury to determine the amount of lost wages—without using Slump as a comparison—resulting from Harman's breach of the agreements. Viewing the facts in the light most favorable to Karch, the damages calculation would not be overly speculative. However, damages will be limited to the time the breach occurred on August 31, 2014, until the date of Karch's termination in February 2018.

## IV.    Conclusion

For these reasons, Harman's motion for summary judgment is **DENIED**.

24

The Scheduling Order is hereby **AMENDED** as follows:

1. The parties must submit an order of facilitation by **March 20, 2023**.

2. Facilitation must occur no later than **May 31, 2023**.

3. The parties must schedule a settlement conference with Magistrate Judge Elizabeth Stafford to occur no later than **July 2023**.

4. Motions in Limine and the Final Pretrial Order are due by **August 1, 2023**.

5. The Final Pretrial Conference is set for **August 22, 2023**.

6. Trial is set to begin at **9:00 am** on **September 12, 2023**.

**IT IS SO ORDERED**.

Dated:        March 8, 2023

s/Gershwin A. Drain
Hon. Gershwin A. Drain
United States District Court Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on March 7, 2023, by electronic and/or ordinary mail.

/s/ Teresa McGovern
Deputy Clerk
